IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-02812-PAB-NYW

PATRICIA LEIGHTON and
DELMAR GEIST,

      Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER,

      Defendant.

---

## ORDER

---

    This matter is before the Court on the Motion to Dismiss Pursuant to Fed. R. Civ.

P. 12(b)(1) and 12(b)(6) [Docket No. 11] filed by defendant the City and County of

Denver.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

Docket No. 1 at 2, ¶ 5.

## I.  BACKGROUND[1]

    Defendant operates the Department of Arts and Venues ("DAV")[2] through which

---

[1]The following facts are drawn from plaintiffs' complaint, Docket No. 1, and are assumed to be true for the purposes of this motion.  *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007).  Defendant also attaches two agreements to its motion, both of which are referred to in the complaint.  *See* Docket Nos. 11-1, 11-2; *see also* Docket No. 1 at 4, 8, ¶¶ 18-19, 34.  Plaintiffs do not object to the Court considering these agreements or dispute their authenticity.  As such, these materials are properly considered in resolving defendant's motion to dismiss.  *See Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("[A] document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.").

[2]The Denver Office of Cultural Affairs ("DOCA") previously administered defendant's public arts program.  Docket No. 1 at 3, ¶ 10.  DOCA became part of DAV

it organizes and funds programs for public art projects in Denver.  *Id.* at 2, ¶ 7.  In

February 2010, defendant sent out a request for artists to submit bid proposals to

design a public art project to be located near the Central Park Boulevard – I-70

Interchange.  *Id.* at 3, ¶ 11.  The request for proposal provided in part that:

> The artist or artist team selected and approved by the Project Selection
> Panel shall be required to enter into a contract with the City and County of
> Denver for the entire duration of the project.

*Id.* at 3, ¶ 15.  On or about March 1, 2010, plaintiffs submitted a proposal.  *Id.* at 3, ¶ 13.

In December 2010, Ms. Kendall Petersen, DOCA's Public Park program manager,

advised plaintiffs that they had been selected to receive the commission for the public

art project.  *Id.* at 4, ¶ 16.  On approximately March 1, 2011, plaintiffs entered into a

written Preliminary Design Contract ("PDC") with defendant to conduct feasibility,

maintenance, architectural, and design studies for a permanently-sited earthwork with

sculptural components.  *Id.* at 4, ¶ 17.  The PDC advised plaintiffs that, after the

completion and acceptance of the feasibility study and preliminary design, the parties

would enter into a Final Commission Agreement ("FCA") to build the artwork.  *Id.* at 4-5,

¶ 19.

The PDC had a maximum budget of $45,000.  *Id.* at 4, ¶ 17.  The PDC provided

for staged payments with $10,000 due upon contract execution; $15,000 for the

preliminary research report; $10,000 for Final Feasibility Report A; and $10,000 for

Final Feasibility Report B.  Docket No. 11-1 at 19.  Based on statements by defendant's

representatives, plaintiffs believed they would recoup their costs in excess of the

_____

through a merger.  *Id.*

$45,000 budget from the final commission budget.  Docket No. 1 at 5, ¶ 20.

Defendant identified multiple sites for plaintiffs' study.  *Id.* at 5, ¶ 23.  From February 2011 to April 2012, plaintiffs researched and developed concepts for five sites.  *Id.*  On April 12, 2012, defendant identified a sixth site, known as the Denver Grove site, for final concept development.  *Id.* at 6, ¶ 24.  From May to July 2012, plaintiffs developed the design concept for the Denver Grove site, presenting it to defendant on July 16, 2012.  *Id.* at 6, ¶ 25.

On August 28, 2012, Barbara Neal informed plaintiffs of an underground culvert bisecting the Denver Grove site that prevents construction over it.  *Id.* at 6, ¶ 27.  At this point, only $5,000 remained in the PDC budget.  *Id.* at 6, ¶ 26.  Plaintiffs revised the design concept and submitted their last invoice on November 12, 2012.  *Id.* at 6, ¶ 28.  During a conference call between the parties on December 13, 2012, defendant requested additional, more detailed elevations, cross-sections, and other architectural renderings along with a detailed maintenance plan for the earth forms.  *Id.* at 7, ¶ 29.  Defendant made the request knowing that the PDC budget was exhausted.  *Id.*  In completing the requested work, plaintiffs incurred expenses and provided services in excess of $75,000.  *Id.* at 7, ¶ 31.

In February 2013, defendant realized that the PDC term had expired.  The parties entered into a "Revival and Amendatory Agreement" ("RAA") to revive, amend, and extend the PDC.  *Id.* at 7, ¶¶ 32-33.  The RAA did not provide for additional compensation.  *Id.* at 8, ¶ 34.  Plaintiffs submitted the work requested by defendant sometime before March 31, 2013.  *Id.* at 8, ¶ 36.  By April 23, 2013, plaintiffs received

3

the full $45,000 paid by defendant for plaintiffs' work under the PDC and RAA.  *Id.* at 8,

¶ 37.

On July 18, 2013, defendant sent plaintiffs a letter advising them that defendant

had decided not to proceed with their design proposal.  *Id.* at 9, ¶ 39.  Defendant

determined that plaintiffs' project was not capable of being brought to fruition with the

allocated public art budget and that plaintiffs' design was not feasible due to the

ongoing maintenance it would require.  *Id.*  The decision regarding the non-feasibility of

plaintiffs' design was made without plaintiffs' input or participation.  *Id.* at 9, ¶ 40.

Defendant has not compensated plaintiffs for their expenditures and services exceeding

the $45,000 PDC budget.  *Id.* at 10, ¶ 44.  Defendant recently announced a new

request for bids for a public art project to be located in the same general vicinity as the

area plaintiffs studied with essentially the same budget as previously announced.  *Id.* at

10, ¶ 45.  Plaintiffs allege on information and belief that defendant's determination of

non-feasibility for plaintiffs' proposed design was pretextual and made in bad faith.  *Id.*

at 9, ¶ 42.

Plaintiffs filed this action on October 15, 2014.  *Id.* at 1.  Plaintiffs bring claims for

promissory estoppel, unjust enrichment and quantum meruit.  *Id.* at 10-13.  Defendant

moves to dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## II.  STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(1)

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if

the Court lacks subject matter jurisdiction over the claim for relief asserted in the

complaint.  "The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction."  *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests."  *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)); *see Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).  To the extent a defendant attacks the factual basis for subject matter jurisdiction, the Court "may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts."  *SK Finance SA v. La Plata Cnty.*, 126 F.3d 1272, 1275 (10th Cir. 1997).  "Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment in such circumstances."  *Id.*

### B.  Federal Rule of Civil Procedure 12(b)(6)

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to plausibly state a claim.  Fed. R. Civ. P. 12(b)(6); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *Alvarado*, 493 F.3d at 1215 (quotation marks

and citation omitted).  At the same time, however, a court need not accept conclusory

allegations.  *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir.

2002).

To survive a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), a complaint

must allege enough factual matter that, taken as true, makes the plaintiff's "claim to

relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th

Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled

to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and

alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 (quoting *Twombly*, 550

U.S. at 570) ("A plaintiff must nudge [his] claims across the line from conceivable to

plausible in order to survive a motion to dismiss.").  If a complaint's allegations are "so

general that they encompass a wide swath of conduct, much of it innocent," then

plaintiffs have not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations

omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a

complaint still must contain either direct or inferential allegations respecting all the

material elements necessary to sustain a recovery under some viable legal theory."

*Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

## III.  ANALYSIS

### A.  Governmental Immunity

The existence of immunity under the Colorado Governmental Immunity Act,

Colo. Rev. Stat. § 24-10-101, *et seq.* ("CGIA"), implicates the Court's subject matter

jurisdiction. *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916,

924 (Colo. 1993) (immunity under the CGIA is a jurisdictional issue); *see also Carnation*

*Bldg. Services, Inc. v. City and Cty. of Denver*, No. 11-cv-00703-CMA-MEH, 2011 WL

6940474 at *3 (D. Colo. Dec. 29, 2011) ("When a claim against a public entity is barred

by the CGIA because it lies in tort or could lie in tort, a court must dismiss the claim for

lack of subject matter jurisdiction").  The CGIA provides, in relevant part, that "[a] public

entity shall be immune from liability in all claims for injury which lie in tort or could lie in

tort regardless of whether that may be the type of action or the form of relief chosen by

the claimant . . . ."[3]  Colo. Rev. Stat. § 24-10-106(1).  However, the CGIA does not bar

actions that arise solely in contract or in promissory estoppel.  *See Berg v. State Bd. of*

*Agric.*, 919 P.2d 254, 258 (Colo. 1996) (en banc); *Bd. of Cty. Comm'rs v. DeLozier*, 917

P.2d 714, 716 (Colo. 1996) (en banc)*; Adams ex rel. Adams v. City of Westminster*, 140

P.3d 8, 10 (Colo. App. 2005).

Because plaintiffs' claims here are framed in the pleadings as quasi-contractual

or equitable, the issue is whether these claims "lie in tort or could lie in tort" and are

thus barred by the CGIA.  See *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1004

(Colo. 2008) (en banc) ("[C]laims that could arise in both tort and contract are barred by

the CGIA, while claims arising solely in contract are not subject to the CGIA.").  The

Colorado Supreme Court has "made clear [that] the form of the complaint is not

---

[3]Defendant is a municipal corporation and political subdivision of the State of Colorado.  Docket No. 1 at 2, ¶ 3.  Plaintiffs do not contest that defendant is a "public entity" within the meaning of the CGIA.

determinative of the claim's basis in tort or contract." *Id*. at 1003 (citing *Berg*, 919 P.2d at 258). Instead, courts "must consider the nature of the injury and the relief sought." *Id.* This is to be done on a case-by-case basis "through a close examination of the pleadings and undisputed evidence." *Id.* at 1004.

For both contractual and quasi-contractual claims, an often dispositive factor is whether "the underlying injury is based on the [defendant's] alleged misrepresentations." *Robinson*, 179 P.3d at 1005 (dismissing claims for breach of contract, breach of express and implied warranties, and breach of the implied covenant of good faith and fair dealing because all claims relied on alleged misrepresentations); *see also DeLozier*, 917 P.2d at 716 (distinguishing an equitable estoppel claim for negligent misrepresentation, where "the misrepresentation must be of material fact that presently exists or has existed in the past," from a promissory estoppel claim, which is based on "[a] promise relating to future events without a present intent not to fulfill the promise"). "[A] claim that is supported by allegations of misrepresentation or fraud is likely a claim that could lie in tort." *Robinson*, 179 P.3d at 1005.

Defendant argues that plaintiffs' claims lie in tort because plaintiffs "allege misrepresentations and other tortious acts or omissions to establish [that defendant] unjustly received a benefit to which it was not entitled." Docket No. 11 at 5. Defendant's motion does not identify the specific allegations that defendant claims are based on misrepresentations, *see id*, but its reply brief lists several such allegations. *See* Docket No. 19 at 2-3.

The underlying injury behind plaintiffs' claims is based on plaintiffs'

understanding, purportedly gleaned from statements made by defendant, that plaintiffs had been awarded the public art commission and that the parties would enter into the FCA upon plaintiffs' completion of the feasibility study.  *See* Docket No. 1 at 4, 7, ¶¶ 16, 19, 29.  Thus, the Court must determine whether plaintiffs' understanding arose from defendant's alleged promise relating to future events or a misrepresentation of present fact.  *DeLozier*, 917 P.2d at 716.  The issue is a close one, as plaintiffs do not identify the statements upon which they allegedly relied with specificity.  Instead, plaintiffs make vague allegations that, because of statements by representatives of defendant, they believed they had been awarded the commission and that they relied on those statements to their detriment.  Specifically, plaintiffs allege that they understood that they would "recoup their costs in excess of the PDC budget from the final commission budget" based on unidentified "statements buy [sic] City representatives[.]"  Docket No. 1 at 5, ¶ 20.  Plaintiffs also allege that, after the $45,000 budget for the feasibility study was exhausted, they incurred additional costs at the city's request in reliance on defendant's request for additional work (made with knowledge that the budget was exhausted) and the representations "that [plaintiffs] had won the commission for the public art project, and that the budget for the project would cover Plaintiffs' additional expenses."  *Id.* at 7, ¶ 31.

In its reply, defendant identifies a number of allegations that "could support tort claims for negligence, misrepresentation/fraud, defamation, conversion/theft, or interference with contractual relations."  Docket No. 19 at 2-3.  Defendant merely recites portions of plaintiffs' complaint, underlining select passages.  *See id.*  Although

defendant does not develop its argument with respect to any particular allegation, the Court will address certain allegations that defendant argues could form the basis for tort claims.

### 1. Reputational Harm Allegations

In the introduction to plaintiffs' complaint, they state that they "seek damages for . . . harm to their professional and business reputations." Docket No. 1 at 2. In their unjust enrichment claim, in describing the damages that plaintiffs have suffered as a result of defendant's alleged conduct, plaintiffs list "loss of professional reputation and standing resulting from their treatment by the City." *Id.* at 12, ¶ 54. Defendant identifies these allegation as grounding plaintiffs' claims in tort, *see* Docket No. 19 at 2-3, presumably because the phrases "reputational harm" and "loss of professional reputation" are typically found in defamation claims. Nowhere in plaintiffs' complaint, however, do they allege that defendant made any defamatory statements about them. Moreover, "the nature of the relief [requested] is not dispositive as to the question of whether a claim lies in tort," but is "merely an aid in understanding the duty breached or the injury caused to determine if the claim lies or could lie in tort." *Robinson*, 179 P.3d at 1006. The Court finds that plaintiffs' claims and the allegations underlying them cannot be recast as a claim for defamation. Accordingly, these allegations do not support defendant's argument that plaintiffs' claims lie in tort.

### 2. Representation that Plaintiffs had been Awarded the Commission

Plaintiffs allege that Ms. Kendall Petersen "advised Plaintiffs that they had been selected to receive the commission." Docket No. 1 at 4, ¶ 16. Elsewhere plaintiffs

allege that, in incurring expenses beyond the PDC budget, they relied on "the representation that they had won the commission for the public art project." *Id.* at 7, ¶ 31. Although plaintiffs' theory of their case is not particularly coherent, plaintiffs attempt to clarify it in their response to the defendant's motion. "Plaintiffs' claims are based on the award to them of the public art commission after their November 4, 2010 presentation as semi-finalists, shortlisted by the City, and the City's representation that work to realize the public art project would proceed collaboratively with stakeholders who would develop the preliminary design direction for a monumental work. . . ." Docket No. 17 at 6. In other words, plaintiffs predicate their claims on the theory that the City, in determining that they won the competition, awarded them the right to complete the commission as part of a collaborative process with the other stakeholders. A close reading of the complaint shows that this assumption is consistent throughout the allegations.[4] The Court will adopt this interpretation. As a result, the Court agrees that the nature of plaintiffs' claim that it was awarded the commission sounds in promissory estoppel and therefore is not subject to characterization as a tort claim. *Robinson*, 179 P.3d at 1004 (a promissory estoppel claim does not lie in tort where "the essence of the claim was the breach of a promise that was detrimentally relied upon").

### 3. Recouping Excess Costs

Defendant identifies several allegations where plaintiffs state that they believed, based on defendant's representations, that they could recoup costs that they incurred in

---

[4]It is also consistent with the fact that plaintiffs have not pled a breach of contract claim. Plaintiffs, for instance, are not claiming that defendant failed to honor the PDC. Rather, plaintiffs are claiming that defendant breached a broader, unwritten promise when it allegedly awarded them the entire commission.

excess of the PDC budget.  Docket No. 19 at 2-3 (referencing paragraphs 20, 29, and 31 of the complaint).  Like the allegations that defendant said plaintiffs won the commission, the underlying premise is that plaintiffs had a promissory right to rely on the commission process moving forward after the PDC.[5]  "[T]he essence" of these allegations is "the breach of a promise that was detrimentally relied upon rather than alleged misrepresentations of certain facts[.]"  *Robinson*, 179 P.3d at 1004.  Therefore, the allegations identified by defendant do not establish that plaintiffs' claims lie in tort and the Court finds that plaintiffs' claims are not barred by the CGIA.

### B.  Failure to State a Claim

#### 1.  *Promissory Estoppel*

Colorado has adopted the promissory estoppel doctrine as articulated in the Restatement (Second) of Contracts.[6]  *Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995).  Promissory estoppel is premised on a fundamental principle of contract law "that one

---

[5]With respect to defendant's argument that certain of the allegations that defendant quotes in its reply "could support" claims for negligence, conversion/theft, or interference with contractual relations, *see* Docket No. 19 at 2, the Court finds that defendant has not identified any allegations relevant to such potential claims and that defendant's argument is not sufficiently developed to warrant consideration.  *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner . . . are waived").

[6]The Restatement states, in relevant part:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90 (1981).

who makes promises must be required to keep them." *DeLozier*, 917 P.2d at 716.  A

prima facie case for relief under this doctrine requires:

> (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise.

*Nelson*, 908 P.2d at 110.  In this context, a promise is "a manifestation of intention to

act or refrain from acting in a specified way, so made as to justify a promisee in

understanding that a commitment has been made."  Restatement (Second) of

Contracts § 2(1) (1981).  "A promise may be stated in words . . . or may be inferred

wholly or partly from conduct," *id.*  § 4, but it must be "clear and unambiguous."  *Hansen*

*v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994).  A promise must also

be sufficiently definite to allow a court to understand the nature of the obligation.

*Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo. App. 1997); *George v.*

*Ute Water Conservancy Dist.*, 950 P.2d 1195, 1199 (Colo. App. 1997).  When a

promise is conditional or performable at a future time, "performance becomes due only

upon the occurrence of the condition or upon the arrival of the specified time."

Restatement (Second) of Contracts § 91; *see Nelson*, 908 P.2d at 110 (adopting § 91,

conditional promise precluded promissory estoppel claim); *Dep't of Transp. v. First*

*Place, LLC*, 148 P.3d 261, 267 (Colo. App. 2006) ("[W]e do not consider the rather

conditional statement of [defendant's] representative [] as a promise.").  "[A]ny

detrimental change of position on the part of the plaintiff prior to the occurrence of the

condition is unreasonable as a matter of law."  *Nelson*, 908 P.2d at 110.

Plaintiffs' promissory estoppel claim alleges that defendant "awarded the Plaintiffs a public art commission" and that plaintiffs expended time and resources in reliance on the promised commission.  *See* Docket No. 17 at 5.  Defendant argues that plaintiffs' allegations demonstrate that any promise that defendant made was conditional.  Docket No. 11 at 6.  Specifically, defendant states that, as alleged in the complaint, any promise defendant made was conditioned on "completion and acceptance of the feasibility study," which would have to be "accepted and agreed to by all the stakeholders" before the parties would enter into a new contract.  *Id.*  Plaintiffs respond that the PDC bound defendant to enter into a final contract.  Docket No. 17 at 9 (noting that the PDC provided that a final agreement "***will be*** executed") (emphasis in original).

Plaintiffs do not allege the precise promise on which they relied, although in their response, plaintiffs identify the PDC as binding defendant to enter into a further agreement.  *See* Docket No. 17 at 9.  The PDC states, in pertinent part:

> Once this feasibility study and a preliminary design direction is accepted and agreed to by all the stakeholders, a new contract will be executed to determine a new scope of work for the execution of the final design and execution of the project.

Docket No. 11-1 at 18.  This language is expressly conditioned on the "accept[ance] and agree[ment]" of "all the stakeholders."  *Id.*  Under Colorado law, a conditional promise cannot form the basis of a promissory estoppel claim.  "It would be manifestly unreasonable for [plaintiffs] to rely on a promise that may or may not bind the [defendant] depending on whether or not a condition occurs."  *Nelson*, 908 P.2d at 110.

Plaintiffs argue that their claim is "nearly identical" to that brought in *Vigoda v.*

*Denver Urban Renewal Auth.*, 646 P.2d 900 (Colo. 1982),[7] in which the Colorado

Supreme Court held that allegations that a defendant made a "promise to negotiate with

[plaintiff] in good faith for the purpose of reaching an agreement" were sufficient to state

a claim for promissory estoppel.  *Id.* at 904-05.  Plaintiffs argue that, like the plaintiff in

*Vigoda*, they expected defendant to act in good faith, Docket No. 17 at 5, and that

defendant failed to do so by providing no explanation for its conclusion that plaintiffs'

design was not feasible or by giving plaintiffs an opportunity to respond.  *Id.* at 9.  In

*Vigoda*, the Denver Urban Renewal Authority ("DURA") invited developers to submit an

"Offer to Negotiate" related to rehabilitation of a building in downtown Denver.  *Id.* at

902.  The Offer to Negotiate "required the developer to negotiate with DURA for ninety

days after DURA's acceptance of the Offer for the redevelopment[.]"  *Id.*  In addition,

DURA required that the selected developer "make a good faith deposit of $7,268 and

make appropriate studies.  It also required the selected developer to submit preliminary

design plans within the first sixty days of the negotiation period."  *Id.*  Based on the

promise to negotiate in good faith, the plaintiff's effort and expenditures made in

reliance on that promise, and the plaintiff's allegation that "DURA refused to negotiate

with her for ninety days," the court found that the plaintiff had stated a claim for

promissory estoppel.  *Id.* at 904-05.

   The Court finds that *Vigoda* is distinguishable from this case.  Although the

parties in *Vigoda* entered into an agreement, that agreement was found unenforceable

by the trial court, a decision that the plaintiff did not appeal.  *See Vigoda*, 646 P.2d at

---

[7]*See* Docket No. 17 at 5.

903 (noting that the trial court found that the contract was an "unenforceable agreement to agree").  Promissory estoppel is not available where, as here, an enforceable contract governs the same subject matter.  *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007) ("Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract"); *Scott Co. of Cal. v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1992), *overruled on other grounds by Lewis v. Lewis*, 189 P.3d 1134 (Colo. 2008) ("[t]he alternative remedy of promissory estoppel is never reached when there has been mutual agreement by the parties on all essential terms of a contract.").  Plaintiff argues that the prohibition on promissory estoppel claims where a valid contract exists does not apply here because the PDC expressly contemplates the negotiation of a future agreement.  Docket No. 17 at 8 (citing Docket No. 11-1 at 18).  But even assuming for the sake of argument that the PDC does not foreclose plaintiffs' claim because it contains an "agreement to agree" and a promise to negotiate, plaintiffs still fail to state a claim for promissory estoppel.  In *Vigoda*, the parties' agreement provided that, for a period of 90 days after acceptance of the plaintiff's offer, the parties would negotiate an agreement.  646 P.2d at 902.  Although the agreement was unenforceable, it reflected a promise to negotiate in good faith that was triggered by DURA's acceptance of the plaintiff's Offer to Negotiate.  *Id*.  That event occurred shortly after the plaintiff submitted her offer.  *Id.*  Here, even if the Court assumes that Appendix A to the PDC, the provision on which plaintiffs rely, constitutes a promise to negotiate the final agreement in good faith, defendant only promised to do so once the "feasibility study and a

16

preliminary design direction [was] accepted and agreed to by all of the stakeholders." Docket No. 1 at 4-5, ¶ 19; Docket No. 11-1 at 18.  That condition did not occur.  Thus, plaintiffs have not alleged that defendants breached a promise upon which plaintiffs could reasonably rely.

Plaintiffs argue that defendant acted in bad faith because defendant summarily rejected plaintiffs' design as "unfeasible," provided no specifics for that determination, and did not give plaintiffs an opportunity to respond.  Docket No. 17 at 9.  Defendant's alleged bad faith rejection of plaintiffs' design, however, does not state a claim for promissory estoppel.  The only potential source of an obligation not to reject plaintiff's design in bad faith comes from the PDC, which does not obligate defendant to provide specifics or give plaintiff the opportunity to convince the stakeholders whose acceptance was a prerequisite to entering into the FCA.  The existence of the PDC forecloses any promissory estoppel claim based on alleged bad faith rejection of plaintiffs' design. *Wheat Ridge*, 176 P.3d at 741.[8]

In sum, because plaintiffs' promissory estoppel claim rests on conditional promises, relates to subject matter governed by an enforceable contract, and does not identify a promise that defendants breached, plaintiffs' claim fails.

---

[8]Because plaintiffs do not explain any terms of the allegedly larger promise that they won the commission and because plaintiffs reference the PDC as a source of certain promissory claims, other language in the PDC demonstrates no reasonable basis for plaintiffs to believe that the City had, in fact, awarded them the entire commission.  For example, the subject matter of the PDC is a "feasibility" study, Docket No. 11-1 at 3, which assumes that the feasibility of the project had not yet been determined.  Moreover, the PDC states that the "City is not obligated to execute an Agreement or any amendments for any further services, including any services performed by Contractor beyond that specifically described in Exhibit A," *id*. at 4, which is inconsistent with a right to payment beyond the feasibility study.

### 2. Unjust Enrichment

An unjust enrichment claim requires a showing of three elements: "that (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Robinson*, 179 P.3d at 1007. "Unjust enrichment is a claim in quasi-contract based on principles of restitution." *W. Ridge Grp., LLC v. First Trust Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (unpublished) (applying Colorado law). "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law-contract." *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003). Colorado courts recognize two exceptions to this general rule. "First, a party can recover on a quasi-contract when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract. Second, a party can recover on a quasi-contract when the party will have no right under an enforceable contract," such as "when an express contract failed or was rescinded." *Id.* (citations and quotations omitted).

Defendant argues that plaintiffs' unjust enrichment claim is barred by the PDC because the contract covers the same subject matter. Docket No. 11 at 10. Plaintiffs do not dispute the existence or validity of an express contract. *See* Docket No. 17 at 11-13. Instead, plaintiffs argue that the additional studies, renderings, elevations, drawings and maintenance plans for the Denver Grove site went beyond the scope of the PDC. *Id.* at 13. The Court disagrees with plaintiffs for two reasons. First, the PDC

covered a broad scope of work.  In the "Scope of Work" provision, the PDC provides

that the "[s]cope of work and materials are unknown at this time and this contract will

cover feasibility of final work . . . ."  Docket No. 11-1 at 18.  The evaluations,

architectural renderings, and detailed maintenance plans requested by defendant were

intended to "determine the scale and scope" of plaintiffs' proposed design.  Docket No.

11-1 at 18.  Plaintiffs agreed to "undertake, perform, and complete all of the services

and produce all the deliverables . . . set forth on Exhibit A, the Scope of Work, to the

City's satisfaction."  Docket No. 11-1 at 3, ¶ 2(a).[9]  Thus, the additional work requested

falls within the subject matter and scope of the PDC.

Second, the contract clearly sets a maximum budget of $45,000.  *See id.* at 3-4,

¶ 4.  The contract stated that "[plaintiffs] shall accept as the sole compensation for

services rendered and costs incurred under the Agreement [$45,000]" and that "[t]here

are no reimbursable expenses allowed."  *Id.* at 3-4, ¶ 4(a)-(b).  Additionally, under a

provision entitled "Maximum Contract Amount," the contract provided that "[t]he city is

not obligated to execute an Agreement or any amendments for any further services,

including any services performed by [plaintiffs] beyond that specifically described in

Exhibit A.  Any services performed beyond those in Exhibit A are performed at

[plaintiffs'] risk and without authorization under the Agreement."  *Id.* at 4, ¶ 4(d)(1).

Thus, even if the Court accepts plaintiffs' argument that the requested work fell outside

---

[9]Plaintiffs misinterpret the contract as allowing them to be reimbursed for certain work that the City requested they perform.  However, payments under the PDC were triggered by the sequential completion of specified reports, *see* Docket No. 11-1 at 19, and not because plaintiffs were being reimbursed for their expenses.  In fact, the PDC states that "[t]here are no reimbursable expenses allowed under the Agreement."  *Id.* at 4.

the scope of the contract, *see* Docket No. 17 at 13, that work could still not form the basis of an unjust enrichment claim.  Plaintiffs expressly disclaimed recovery of any expenses beyond $45,000, including for work beyond the "scope of work" agreed upon in Exhibit A to the PDC.  The express terms of the written contract override any purported implied contract.

### 3.  *Quantum Meruit*

"Quantum meruit is a theory of contract recovery that invokes an implied contract when the parties either have no express contract or have abrogated it." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000) (en banc).  Quantum meruit is an "equitable doctrine" that "seeks to restore fairness when a contract fails." *Id.* at 445. "If an express contract exists, there can be no implied contract covering the same subject matter between the parties because the provisions of the express contract supersede those of the implied contract." *Specialized Grading Enters., Inc. v. Goodlands Constr., Inc.*, 181 P.3d 352, 354 (Colo. App. 2007).  "[H]owever, this rule does not apply if the implied agreement is based upon the conduct of the parties subsequent to, and not covered by, the terms of the express contract." *Id.* (internal citations omitted).  Therefore, quantum meruit is an appropriate claim of relief "when substantial changes occur which are not covered by the contract and are not within the contemplation of the parties and the effect of such changes is to require extra work or to cause substantial loss to the contractor." *CAMAS Colorado, Inc. v. Bd. of Cty. Comm'rs*, 36 P.3d 135, 139 (Colo. App. 2001) (quoting *Scott Co. v. MK-Ferguson Co.*, 832 P.2d 1000, 1002-03 (Colo. App. 1991)).

Plaintiffs argue that defendant has refused to honor the final commission it awarded plaintiffs. Docket No. 1 at 13, ¶¶ 57-59. For the reasons previously articulated in this order, the Court disagrees. The PDC confirms that plaintiffs were awarded only the opportunity, dependent on certain contingencies, to receive the final commission. *See* Docket No. 11-1 at 18. Acceptance of the feasibility study and preliminary design by all stakeholders was a condition precedent to plaintiffs' securing the commission, *id.*, and plaintiffs do not allege that defendant failed to pay the $45,000 owed under the PDC.

Plaintiffs next argue that defendant owes them the reasonable costs of the requested drawings, renderings, and feasibility studies that exceeded the $45,000 budget. Docket No. 17 at 12. As discussed with respect to plaintiffs' unjust enrichment claim, however, the parties signed a contract that set defendant's maximum payment obligation at $45,000. Docket No. 11-1 at 4, ¶ 4(d)(1). And as discussed above, even if the requested work fell beyond the "Scope of Work" defined in the PDC, plaintiff agreed that any such services would be "performed at [plaintiffs'] risk." *Id.* The Court finds that plaintiffs' quantum meruit claim is barred by the parties' contract.

### C. Attorney's Fees

When a tort claim "is dismissed on motion of the defendant prior to trial under Rule 12(b) of the Colorado rules of civil procedure, such defendant shall have judgment for his reasonable attorney fees in defending the action." Colo. Rev. Stat. § 13-17-201; *see Jones v. Denver Post Corp.*, 203 F.3d 748, 757 n.6 (10th Cir. 2000) ("Section 13-17-201 expressly applies only to actions dismissed under Rule 12(b) of the Colorado

Rules of Civil Procedure.  However, we find the statute applies with equal force when a federal court dismisses a pendent state tort pursuant to Fed. R. Civ. P. 12(b)(6).").

"[A]n award of attorney fees is mandatory when a trial court dismisses an action under Rule 12(b)." *Infant Swimming Research, Inc. v. Faegre & Benson, LLP*, 335 F. App'x 707, 715-16 (10th Cir. 2009).

Defendant requests the Court grant it reasonable attorney's fees pursuant to Colo. Rev. Stat. § 13-17-201.  Docket No. 11 at 15.  Because the Court determined that plaintiffs' claims do not lie in tort and did not dismiss plaintiffs' claims under the CGIA, defendant's request for attorney's fees is denied.[10]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant the City and County of Denver's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [Docket No. 11] is **GRANTED** in part and **DENIED** in part as reflected in this Order.  It is further

**ORDERED** that plaintiffs Patricia Leighton and Delmar Geist's first, second, and third claims for relief are dismissed with prejudice.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendant may have its costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is dismissed in its entirety.

---

[10]Because the Court finds that plaintiffs fail to state a claim upon which relief may be granted, the Court need not and does not address defendant's argument that plaintiffs' implied contract claims fail because plaintiffs are charged with constructive knowledge of the Home Rule Charter of the City and County of Denver, which requires the signature of the Mayor to create a valid contract.  *See* Docket No. 11 at 13-15.

DATED September 21, 2015.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge